IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| 1633 BROADWAY MARS RESTAURANT CORP., | ) Case No. 07-14062 (ALG) |
| | ) |
| | ) Adv. Proc. No. _____ |
| Debtor | ) |
| | ) |
| | ) |
| 1633 BROADWAY MARS RESTAURANT CORP., | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| - against - | ) |
| | ) |
| PARAMOUNT GROUP, INC., as agent for PGREF I, 1633 BROADWAY TOWER L.P., | ) |
| | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff 1633 BROADWAY MARS RESTAURANT CORP. D/B/A MARS 2112 ("Debtor"), a New York corporation, Debtor and Debtor-in-Possession, by its bankruptcy counsel HOFHEIMER GARTLIR & GROSS, LLP and proposed special real estate counsel HERRICK, FEINSTEIN, LLP, for its complaint against defendant PARAMOUNT GROUP, INC., as agent for PGREF I, 1633 BROADWAY TOWER L.P. ("Landlord"), respectfully alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. Debtor is a New York corporation, and debtor and debtor-in-possession, with its principal place of business at 1633 Broadway, City, County and State of New

York. On December 28, 2007, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

2. Upon information and belief, Landlord is a New York limited partnership with an office for the transaction of business at 1633 Broadway, City, County and State of New York.

3. The Court has jurisdiction over this adversary proceeding pursuant to the provisions of 28 U.S.C. §§ 157(b)(2)(A) and (E) and 1334.

4. This proceeding constitutes a core proceeding with the meaning of 28 U.S.C. § 157(b)(2)(A) and (E).

5. Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6. On or about January 30, 1998, Debtor, as tenant, and Landlord's predecessor-in-interest, as landlord, entered into a lease for nonresidential real property located on a portion of the subterranean C level and 1C level of the 48 story building located at 1633 Broadway, located in the City, County and State of New York ("Building") ("Lease"). A copy of the Lease is annexed hereto and made a part hereof as Exhibit "A." The premises subject to the Lease is approximately 32,868 square feet ("Premises").

7. The term of the Lease is 20 years with a five year option to renew by Debtor to extend the term to 2023.

8. The current rent, including real estate taxes, is in excess of One Million Dollars per annum. Debtor is also required to pay a percentage rent based upon its sales.

Debtor is current in its payment of rent other than the January 2008 rent which was rejected and is being held in the escrow by bankruptcy counsel. Moreover, the Landlord holds a One Million Dollar letter of credit security deposit pursuant to the terms of the Lease.

9. Upon information and belief, Debtor's rent under the Lease has been substantially less than market rate since approximately January 2006, and if the Premises is recaptured by Landlord, Landlord will gain significant additional annual revenue, totaling in excess of Five Million Dollars over the balance of the Lease term, and the value of the Building will be increased by a significant amount, well in excess of Five Million Dollars.

10. Debtor has made a substantial investment in its restaurant business. Not only has it paid approximately Ten Million Dollars in rent since Lease inception, it has made a substantial investment of approximately Seventeen Million Dollars in designing, constructing, updating and modernizing its facility. Additionally, it has invested significant monies in advertising and promoting its location and business. Debtor employs between 125 and 350 employees, depending on the season.

11. Debtor is a well-known and respected interactive outer space-themed restaurant and bar and a family destination for New Yorkers and tourists.

12. In addition to serving lunch and dinner seven days a week, Debtor hosts a number of corporate and celebrity events, late-night events, children's parties, bar mitzvahs and bat mitzvahs, product launches, video shoots,, and production wraps and parties.

13. Debtor also sponsors various charitable activities at its restaurant.

14. On March 27, 2002, Debtor filed its first voluntary chapter 11 petition in United States Bankruptcy Court for the Southern District of New York (In re 1633 Broadway Mars Corp., 02-011406 (ALG) (the "Prior Case"). Debtor reorganized under the protection afforded by this Court and, pursuant to this Court's Order dated January 20, 2005, Debtor's plan of reorganization (the "Plan") was confirmed. The Plan was fully consummated and, on August 30, 2005, a final decree was entered and the Prior Case was closed.

15. Pursuant to the terms of a stipulation between Debtor and Landlord, which was so-ordered by the Confirmation Order of this Court dated January 20, 2005, Debtor was required to complete its installation of a cooling tower by December 31, 2007 ("Cooling Tower"). A copy of this stipulation is annexed hereto and made a part hereof as Exhibit "B."

16. The essential reason why Debtor was unable to complete its installation of the Cooling Tower by December 31, 2007 was due to the Landlord's interference with the Debtor's efforts to finance such installation through a wrongful effort to interfere with the Debtor's cash flow and to, without just cause, terminate the Lease. The Landlord improperly and tortiously interfered with Debtor's agreements to raise the necessary funds to complete the installation, and breached its duty to perform its obligations under the Lease in good faith and with fair dealing, all with the intention to force Debtor to return its valuable asset, viz., the Lease, to Landlord before the end of the Lease term, all as set forth in detail in paragraphs "26" through "34" inclusive below.

17. The function of the Cooling Tower is to provide condensed water exclusively for Debtor's air conditioning system. In 1998, when the Lease was entered

into, it was not known whether the Building could provide sufficient condensed water for Debtor's space and for the rest of the Building.  Since that time, it has become apparent that Debtor's use of the condensed water provided by the Landlord had not overtaxed the Building's system and, accordingly, the need for the Cooling Tower had receded.  Over the years, Debtor has paid significant sums, approximating $75,000 per annum, to the Landlord for condensed water.

18.     Pursuant to section 17.06 of the Lease, the Cooling Tower was originally supposed to be installed by April, 2000.  The Cooling Tower was not started or installed by that date and the Landlord did not issue any notices of default regarding the Cooling Tower.

19.     Approximately seven years after the Lease was entered into, the Cooling Tower issue resurfaced as part of the Prior Order, in which Debtor agreed to construct the Cooling Tower by December 31, 2007.

20.     Notwithstanding the lack of necessity for it, Debtor intends to install the Cooling Tower, and the process is well underway.  However, since the Cooling Tower is not necessary for the Landlord's operation of the Building, the Landlord has not suffered any damage due to the delayed installation of the Cooling Tower.

21.     At the time Debtor and Landlord negotiated the Deadline for the installation of the Cooling Tower, the parties believed that the estimated cost was approximately $500,000.  However, the actual cost will likely be approximately $1 million.  Debtor also knew that the financing of such a project would require stable earnings and defensible projections of future cash flow and profitability.  Accordingly, it

was always contemplated that the process of installing the Cooling Tower would not commence until the beginning of 2007, and the Landlord had agreed to such schedule.

22. At the time of confirmation, Debtor estimated that the entire process from design to installation of the Cooling Tower would take approximately nine months to complete. Therefore, the commencement of the process in the beginning months of 2007 would have been sufficient to complete the installation.

23. The Prior Order did not require Debtor to provide Landlord with progress reports on the Cooling Tower installation until January, 2007. In fact, Landlord made no objection until April 2007.

24. Following confirmation of the Plan, Debtor's business stabilized and became profitable. For a period of time, Debtor and Landlord enjoyed a relatively peaceful relationship. In fact, in or about October 2006, the Landlord requested, and Debtor executed, an estoppel certificate stating, *inter alia*, that Debtor was not in default under the terms of the Lease.

25. At the beginning of 2007, Debtor was on track with its plan to finance and commence the design and installation process of the Cooling Tower.

26. From 2002 until March 2007, Landlord did not serve any default notices or notices to cure on Debtor. As property values kept increasing in the Times Square area and the rent paid by Debtor became further and further below market, Landlord instigated the deterioration of the relationship between it and Debtor and undertook a campaign of harassment to frustrate Debtor's ability to operate its business and to complete the installation of the Cooling Tower by the Deadline.

27. On March 1, 2007, Landlord served Debtor with a 3 day notice to cure (the "Original Notice to Cure") disingenuously alleging that Debtor was in default under the Lease. The alleged default was Debtor's hosting of late-night functions at the Premises. The Original Notice to Cure was served notwithstanding the fact that the same type of functions had been taking place since 2002; notwithstanding the fact that Debtor had always given Landlord prior notice of all functions; notwithstanding the fact that Landlord had not objected to any of the allegedly violative functions; and notwithstanding that the Landlord had not objected to similar functions from 2002 to 2007.

28. Debtor moved for and obtained an order of the Supreme Court of the State of New York, County of New York (Index No. 102995/07), dated July 18, 2007, granting it a Yellowstone injunction prohibiting Landlord from terminating the Lease. The Court found that the Original Notice to Cure was "facially insufficient and defective." Landlord appealed but, after serving the Second Notice to Cure (as defined in paragraph 30 below) in the same action, withdrew its appeal.

29. On or about May 24, 2007, Landlord served a default letter on Debtor alleging that it did not have sufficient insurance coverage as required by the Lease. Landlord asserted that the insurance coverage must be increased from $5 million to $100 million, an amount far in excess of the norm. Debtor asserted its right to arbitrate the issue as provided by the Lease. Debtor voluntarily increased its insurance coverage to $20 million, and Landlord never responded to Debtor's demand to arbitrate.

30. On August 23, 2007, Debtor received a second notice to cure (the "Second Notice to Cure") from Landlord making nearly identical allegations as the

Original Notice to Cure. Debtor was required to obtain a second Yellowstone injunction with regard to the Second Notice to Cure, which was issued on August 27, 2007 under the same index number as the first Yellowstone injunction.

31. Landlord's aforesaid notices to cure were based on extremely exaggerated, if not false, descriptions of the functions held at the Premises, including unfounded allegations of drug use and assaults. Landlord's own agents actually smuggled a gun into the restaurant in an attempt to discredit Debtor.

32. Landlord's actions succeeded in derailing Debtor's plans to install the Cooling Tower in early 2007, since its service of the meritless notices to cure and default notices frustrated Debtor's ability to finance the installation of the Cooling Tower by engendering uncertainty over the status of the Lease and Debtor's ability to remain in business.

33. Upon information and belief, certain of Landlord's employees have communicated to the employees of Debtor and Debtor's vendors that Debtor would close after December 2007 further hindering the ability of Debtor to remain in business and finance the installation of the Cooling Tower.

34. Landlord's actions prevented Debtor from installing the Cooling Tower by (1) destroying Debtor's ability to obtain funding from its investors by jeopardizing the Lease and jeopardizing the operation of late-night functions which generate significant revenue; (2) thwarting the ability of Debtor to seek outside funding; and (3) causing financial damage to Debtor through the expenditure of attorneys' fees and by lost profits otherwise earned when it voluntarily ceased hosting late-night functions for two to three weeks as a show of good faith following the service of the Original Notice to Cure.

35. Pursuant to Article 35 of the Lease, Landlord is required to provide Debtor quiet enjoyment of the Premises "without hindrance or molestation by Landlord."

36. Sections 17.01, 17.02, 17.03 and 17.06 of the Lease provide for tenant charges for heat and air conditioning. Pursuant to said provisions (specifically 17.06), Debtor has been overcharged the sum of $282,170 for supplemental air conditioning, representing charges for "Extra Air Conditioning Service" during business hours, and the sum of $71,542 for heating. With interest in the amount of $120,000, Landlord Landlord is liable to Debtor in the amount of $473,712 for supplemental air conditioning and heat overcharge.

37. Investors of Debtor have deposited the sum of $600,000 in escrow with Debtor's bankruptcy counsel towards the cost of the installation of the Cooling Tower, conditioned on a declaration that the Lease is in full force and effect without default. A copy of the letter from the investors is annexed hereto and made a part hereof as Exhibit "C." Debtor has a pledge for the balance of the money needed for the installation of the Cooling Tower. Debtor also deposited its January 2008 rent in escrow with its bankruptcy counsel after the rent was rejected by Landlord and will continue to so deposit any future rent that is rejected by Landlord.

### FIRST CAUSE OF ACTION

(Breach of Contract)

38. Debtor repeats and realleges paragraphs "1" through "37" hereof.

39. Landlord's service of its improper, unjustified and malicious notices to cure and its attempts to terminate the Lease constitute the breach of the Lease, including but not limited to Article 35 thereof.

40. Landlord's issuance of its improper, unjustified and malicious notices to cure required Debtor to expend attorneys' fees in order to obtain two Yellowstone injunctions from the Supreme Court of the State of New York.

41. By reason of the foregoing, Landlord is liable to Debtor in an amount to be determined, but in excess of $100,000 plus interest.

## SECOND CAUSE OF ACTION

(Tortious Interference with Contract and
with Prospective Contractual Relationship)

42. Debtor repeats and realleges paragraphs "1" through "37" and "39" through "40" hereof.

43. Landlord's improper, unjustified and malicious attempts to terminate Debtor's tenancy were performed for the purposes of harming Debtor's business, interfering with Debtor's rights under the Lease, and for dissuading investors (whether shareholders of Debtor or others) from investing in Debtor and for providing sufficient capital to install the Cooling Tower.

44. But for Landlord's unlawful interference, Debtor would have been able to raise the funds necessary to complete the installation of the Cooling Tower by December 31, 2007.

45. By reason of the foregoing, Landlord is liable to Debtor for the lost value of its interest in the Lease in an amount to be determined plus interest.

## THIRD CAUSE OF ACTION

(Breach of Lease)

46. Debtor repeats and realleges paragraphs "1" through "37", "39" through "40" and "43" through "44" hereof.

47. Landlord has overcharged Debtor for supplemental air conditioning and heat pursuant to the terms of the Lease.

48. By reason of the foregoing, Landlord is liable to Debtor in the amount of $473,712 including interest for said overcharges plus further interest to accrue.

### FOURTH CAUSE OF ACTION

(Breach of Good Faith and Fair Dealing)

49. Debtor repeats and realleges paragraphs "1" through "37", "39" through "40", "43" through "44" and "47".

50. The Lease contains implied covenants of good faith and fair dealing.

51. Landlord has breached those covenants by its conduct alleged herein, including but not limited to serving unjustified Notices to Cure and its attempts to prevent Debtor from installing the Cooling Tower in an attempt to recapture the Premises.

52. By reason of the foregoing, Debtor has been damaged in an amount to be determined.

### FIFTH CAUSE OF ACTION

(Declaratory Judgment)

53. Debtor repeats and realleges paragraphs "1" through "37", "39" through "40", "43" through "44", "47" and "50" through "51".

54. In order to resolve this controversy, Debtor requests that, pursuant to 28 U.S.C. § 2201 and § 105 of the Bankruptcy Code, this Court declare the respective rights and duties of the parties in this matter and, in particular, that the Court declare that (i) the Bankruptcy Code, and more specifically Sections 105 and 362, authorizes the Court to toll the time for Debtor to install the Cooling Tower at the Building for a period of up to

210 days without Landlord's consent; (ii) the Bankruptcy Code § 365 authorizes the Court to permit Debtor to provide adequate assurance that it will cure any alleged default under the Lease at the time of Assumption or such other future date the Bankruptcy Court orders by installing the Cooling Tower: and (iii) by installing the Cooling Tower by the date required by the Bankruptcy Court, the Debtor is not in default under any of the terms of the Lease and has complied with all of its obligations under the Lease.

### SIXTH CAUSE OF ACTION

(Injunction)

55. Debtor repeats and realleges paragraphs "1" through "37", "39" through "40", "43" through "44", "47" and "50" through "51".

56. Landlord's service of Notices to Cure and its attempts to recapture the Premises, all without cause, are causing Debtor irreparable harm, including but limited to potential loss of employees, customers, vendors and investors .

57. Debtor has no adequate remedy of law.

58. By reason of the foregoing, Debtor is entitled to a permanent injunction prohibiting Landlord from serving it with unsubstantiated Notices to Cure and from interfering with Debtor's relationships with its customers, vendors, employees and investors.

WHEREFORE, Debtor demands judgment as follows.

1. On its First Cause of Action judgment in an amount to be determined but in excess of $100,000;

2. On its Second Cause of Action in an amount to be determined;

3. On its Third Cause of Action in the amount of $473,712 plus further interest;

4. On its Fourth Cause of Action in an amount to be determined plus interest;

5. On its Fifth Cause of Action declaring that (i) the Bankruptcy Code, and more specifically Sections 105 and 362, authorizes the Court to toll the time for Debtor to install the Cooling Tower at the Building for a period of up to 210 days without Landlord Landlord's consent; (ii) the Bankruptcy Code § 365 authorizes the Court to permit Debtor to provide adequate assurance that it will cure any alleged default under the Lease at the time of Assumption or such other future date the Bankruptcy Court orders by installing the Cooling Tower: and (iii) by installing the Cooling Tower by the date required by the Bankruptcy Court, the Debtor is not in default under any of the terms of the Lease and has complied with all of its obligations under the Lease..

6. On its Sixth Cause of Action, granting a permanent injunction against Landlord from serving Debtor with unsubstantiated Notices to Cure and from interfering with Debtor's relationships with its customers, vendors, employees and investors; and

7. On all causes of action granting Debtor such other and further relief as the Court may deem just and proper and granting Debtor costs, disbursements and reasonable attorneys' fees.

Dated: New York, New York
January 28, 2008

        HOFHEIMER GARTLIR & GROSS, LLP

        By: /s/ David L. Birch
        Counsel for Debtor and Debtor in Possession
        David L. Birch (DB4410)
        Scott R. Kipnis (SK9147)
        530 Fifth Avenue
        New York, New York 10036
        (212) 818-9000

        HERRICK, FEINSTEIN, LLP
        Proposed Special Real Estate Counsel
         to the Debtor
        Joshua J. Angel (JA3288)
        Scott E. Mollen (SM2771)
        2 Park Avenue
        New York, New York 10016
        (212) 592-1400