**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                                    Chapter 11

        1633 BROADWAY MARS                 Case No. 07-14062 (ALG)
        RESTAURANT CORP.,

                    Debtor.

------------------------------------------------------------x

1633 BROADWAY MARS
RESTAURANT CORP.,

                    Plaintiff,

        -against-                          Adv. Proc. No. 08-01045 (ALG)

PARAMOUNT GROUP, INC., as agent
for PGREF I, 1633 BROADWAY TOWER, L.P.

                    Defendant.

------------------------------------------------------------x

### MEMORANDUM OF OPINION AND ORDER ON
### PARAMOUNT GROUP, INC.'S MOTION TO DISMISS

A P P E A R A N C E S :

HOFHEIMER GARTLIR & GROSS, LLP
Attorneys for Debtor
  By:  Scott R. Kipnis, Esq.
       Douglas Gross, Esq.
       Nicholas B. Malito, Esq.
530 Fifth Avenue
New York, New York 10036

STEVENS & LEE, P.C.
Attorneys for Paramount Group, Inc.
  By:  Chester B. Salomon, Esq.
       Constantine D. Pourakis, Esq.
485 Madison Avenue, 20th Floor
New York, New York 10022

ROSENBERG & ESTIS, P.C.
Attorneys for Paramount Group, Inc.
  By:   Howard W. Kingsley, Esq.
        Hal N. Beerman, Esq.
733 Third Avenue
New York, New York 10017

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion to dismiss the Chapter 11 petition of 1633 Broadway

Mars Restaurant Corp. (the "Debtor"), brought by Paramount Group, Inc., the Debtor's

landlord (the "Landlord").  The Landlord has moved to dismiss the case on the ground

that it is a bad faith attempt to modify an earlier plan of reorganization that has been

substantially consummated.  The Court held an evidentiary hearing over the course of

five days.[1]

BACKGROUND

*The Debtor*

The Debtor is a corporation wholly-owned by Mars Acquisition Corp. ("MAC"),

a holding company that in turn is owned by a group of investors in Ireland.  In 1998, the

Debtor and Landlord entered into a nonresidential Lease for space at 1633 Broadway,

between 50th and 51st Streets, in New York City.  The Debtor rents approximately

33,000 square feet of space accessed from a plaza opening to the street and operates a

theme restaurant called Mars 2112, catering principally to children and their families.[2]

---

[1] The evidentiary hearing also subsumed the Debtor's motions for an extension of the period in which it
may assume or reject its nonresidential real property lease (the "Lease") under § 365(d)(4)(B) and for an
extension of the period in which it has the exclusive right to file a plan of reorganization and solicit
acceptances thereof under § 1121(d)(1) of the Bankruptcy Code.  As the hearing progressed, it became
clear that the Debtor's motions would need to be dealt with prior to a decision on the motion to dismiss
because of looming deadlines under the Code.  The Court granted the Debtor's motions for extensions of
time by order dated April 23, 2008.
[2] As discussed below, the Debtor also rents out the restaurant for late-night parties that are decidedly not
oriented toward children and their parents.

The Landlord's building is a "Class A" 50-story office tower with "blue chip" tenants and is also the home of the Gershwin Theatre, currently the largest legitimate theatre on Broadway.

The Lease, dated as of January 30, 1998, is a comprehensive 109-page document providing for, among many other things, payment of rent, use of the premises, and improvements. Importantly, for purposes of this motion, the Lease as originally drafted required the Debtor to construct, within two years of commencement of operations, a cooling tower to provide condenser water for a separate air conditioning system. The cooling tower would enable the restaurant to obtain its own air conditioning and to detach itself from the building's system, which in turn would free up capacity so that the Landlord could provide additional condenser water to other tenants.[3] The Debtor did not construct a cooling tower within the first two years of its operations; the record does not show whether the Landlord informally waived the requirement or whether there was a Lease amendment.

*The Debtor's First Chapter 11 Case*

In any event, the Debtor fell on hard times and on March 27, 2002 filed its first Chapter 11 case. There is no issue that the Debtor was in financial distress when it filed in 2002. According to its papers in that case, "The immediate need for commencement of the case is insufficient working capital. Mars 2112's underlying financial difficulties arise out of inadequate customer and sales volume . . . especially in light of the tragic

---

[3] Roger Newman, Senior Vice President of Property Management for Paramount Group, testified that other tenants have asked for additional cooling, and the Landlord has had to turn them down. With the Debtor removed from the building's general service, the Landlord would be able to sell more supplemental air conditioning to other tenants at $1000 and $1200 per ton of water. Newman testified that capacity to meet a tenant's additional cooling needs improves goodwill and is a factor in tenants' decisions to renew leases and potential tenants' decisions to rent space in the building. A cooling tower would also permit the Debtor to obtain its air conditioning independently, as other tenants have done; the record does not show whether the cost, amortized over the Lease, would be more or less than the Debtor is currently paying.

events of September 11, 2001." (Rule 1007-2 Affidavit of Joseph C. Dolan, Case No. 02-

11406, ECF# 1, Exh. B.)

Two developments in the prior case are of importance to the instant motion.  First,

during the course of the case, the Landlord filed an adversary proceeding seeking to

prevent the Debtor from continuing to conduct late-night parties at the restaurant.  The

Landlord relied on a use-clause in the Lease providing that the Debtor would use the

premises "solely for the operation and maintenance of a high quality public sit-down

table service tablecloth restaurant…" and claimed that the parties damaged its ability to

maintain the Class A character of the building.  The Landlord's motion for an injunction

was resolved by a stipulation, dated November 6, 2002, providing that after December

31, 2002 the Debtor "shall not host any Events or other functions substantially similar to

the Events, regardless of the type of music or theme, at the Premises without the express

written consent of the Landlord in its sole and absolute discretion…"  The term "Events"

was defined as "certain hip-hop/rap special functions, including, without limitation the

'Planet Rock' functions and other events sponsored by the Power 105.1 radio station …

[that] have taken place at the Premises."

The second development in the prior bankruptcy case was a settlement of all

issues between the Landlord and the Debtor that the Debtor has conceded, in this case,

represented economic concessions that it needed to confirm its Plan.  The agreements

with the Landlord were incorporated in a Stipulation, dated January 20, 2005, that was an

exhibit to and approved and so-ordered by the Court in the Confirmation Order.  The

Stipulation reduced the Debtor's rent, changed certain other terms of the Lease and, again

critically for purposes of this case, extended the Debtor's time to construct the cooling

tower by an additional three years.  The clause with respect to the cooling tower

purported to create a conditional limitation in the Lease that would result in automatic

termination of the Lease if the tower were not installed by December 31, 2007.  It reads

as follows:

> 7.      The Debtor shall be required to install an evaporative cooler as
> contemplated in section 17.06 of the Lease so that installation is
> completed by December 31, 2007.  Starting no later than January 1, 2007,
> the Debtor shall provide weekly written reports to the Landlord as to the
> status of such installation (the "Progress Reports").  Failure to complete
> such installation by December 31, 2007 (the "Installation Deadline") shall
> be deemed to constitute a breach of a conditional limitation resulting in the
> immediate termination of the Lease.  (Landlord's Exh. 6A.)

The provisions in the Stipulation relating to the Lease were thereafter incorporated in the

Lease as amendments.  According to the Final Decree in the Debtor's first case, the

Debtor's Plan was substantially consummated on or before August 29, 2005.

It appears that relations between the Debtor and the Landlord remained

unexceptional for the rest of 2005 and 2006, or the record does not indicate otherwise.  It

also appears that the Debtor continued to lease out its space for late-night parties,

providing the Landlord with notice and a list of the parties and receiving no apparent

complaints.  On the night of February 3-4, 2007, however, an incident took place at

approximately 3:40 a.m. that resulted in a fight and a victim with lacerations on both

sides of his head.  The Landlord, quoting the police report, places the fight in the

Debtor's "club"; the Debtor claims the fight took place outside on the street.  In any

event, the Landlord sent the Debtor a demand that it cease operating "a nightclub in the

Premises" and when the Debtor only canceled the parties for a few days, sent the Debtor

a notice of default, dated March 1, 2007, formally advising the Debtor that there were

violations of the Lease's use provisions and purporting to terminate the Lease.  The

5

Debtor responded, asserted that it was not in violation of the Lease and filed an action in

State court, obtaining a "*Yellowstone*" injunction that tolled the time to cure the default

pending judicial determination of the dispute.[4]  The State proceeding was not resolved

until July 27, 2007, when the State court ruled that the Landlord's notice had been

improperly vague and inadequate, in response to which the Landlord sent a new notice,

dated August 23, 2007, and the Debtor obtained a second *Yellowstone* injunction.  The

second State case was scheduled for trial on April 9, 2008, but was eventually stayed by

the instant bankruptcy filing; neither party has taken any action to pursue the case since

the bankruptcy petition was filed.

The foregoing dispute may have disrupted the amicable landlord-tenant

relationship.  For whatever reason, subsequent to the March notice of default, the

Landlord served the Debtor with a series of notices with respect to alleged defaults under

the Lease.  One, sent on April 3, 2007, was based on the Debtor's failure to pay rent on a

timely basis and provide reports on its progress in constructing the cooling tower.[5]

Although the Debtor claimed that it had typically and in the ordinary course of business

paid rent within 30 to 45 days of invoice, it paid the amounts and cured.  It also began

---

[4] A *Yellowstone* injunction, named after the case *First Nat'l Stores v. Yellowstone Shopping Ctr.*, 21
N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968), is a remedy which "maintains the status quo so
that a commercial tenant, when confronted by a threat of termination of its lease, may protect its investment
in the leasehold by obtaining a stay tolling the cure period so that upon an adverse determination on the
merits the tenant may cure the default and avoid a forfeiture."  *Graubard Mullen Horowitz Pomeranz &
Shapiro  v. 600 3rd Ave. Assoc's*, 93 N.Y.2d 508, 514, 693 N.Y.S.2d 91, 94, 715 N.E.2d 117, 120 (1999).
In *Yellowstone*, the New York Court of Appeals held that even though a landlord-tenant dispute over
obligations under a lease was resolved in favor of the tenant, because the tenant had not requested a
temporary restraining order in connection with its declaratory judgment action, the State court was unable
to revive a lease that terminated before the dispute was resolved.  "While seemingly unremarkable, the
*Yellowstone* case ushered in a new era of commercial landlord-tenant law in New York State.  As a result
of this decision, tenants developed the practice of obtaining a stay of the cure period before it expired to
preserve the lease until the merits of the dispute could be resolved in court."  *Graubard Mullen*, 93 N.Y.2d
at 514, 693 N.Y.S.2d at 94, 715 N.E.2d at 120.
[5] It will be recalled that the Stipulation quoted above, later incorporated in the Lease, required the Debtor
not only to install the cooling tower by December 31, 2007 but also to provide the Landlord with reports
throughout 2007 on its progress.

providing reports on the cooling tower.  On May 7, 2007, the Landlord sent a notice of

default for failure to provide a verified statement of gross sales, and the Debtor again

cured.  On May 23, 2007, the Landlord demanded the Debtor increase its liability

insurance coverage from $5 million to $100 million.  The Debtor demanded arbitration of

this issue in accordance with the provisions of the Lease, but the parties ultimately

settled, and the Debtor increased its coverage to $15 million.

Although, as mentioned above, the Debtor commenced sending reports to the

Landlord on installation of the cooling tower in response to the Landlord's notice of

default, the early reports showed *no* progress whatsoever.   In April 2007, Daniel Breslin,

the Landlord's property manager, and Mary Hanlon, the Debtor's CEO and President,

began emailing one another about the status of the cooling tower's construction.   In May

2007, Hanlon informed Breslin that the Debtor had retained Cosentini Brothers as

consultants on the project, and it later retained Plaza Construction as general contractor

on the project.[6]  Notwithstanding the retention of a general contractor, however, virtually

no progress was made until the very end of 2007, shortly before this case was filed.  After

December 5, 2007, the Landlord and Debtor, usually through Hanlon and Breslin,

exchanged a flurry of emails scheduling walkthroughs, canceling and rescheduling

walkthroughs, requesting more information from one another (mostly drawings of

---

[6] The Lease gave the Landlord rights of approval of the Debtor's contractors, and it ultimately approved
Plaza, even though Plaza is not on the Landlord's pre-approved list for general contractors for major
projects on the Building.  After filing this case, the Debtor apparently fired Plaza and hired another
company as general contractor, on the ground the latter concern would do the work for $400,000 less than
Plaza.  The Landlord, however, refused to approve the substitute concern on the premise that the substitute
did not have enough experience in "Class A" commercial buildings on a project that, if improperly
executed, could cause major damage to the building and its other tenants.  The Court was asked to
determine whether the Landlord was within its rights under the Lease to reject the substitute as general
contractor for this project.  On April 15, 2008, the Court ruled that the project entailed base-building work
as defined in § 5.01(e)(i) of the Lease and that the Landlord could reject the substitute in its complete
discretion.  The Court also found that even if this project were not base-building work, the Landlord's
rejection was reasonable under the circumstances in view of the nature of the project.  The Debtor
thereafter retained Plaza once again.

existing infrastructure), and explaining that information was already sent, irrelevant to the project, or unavailable because tenants on the relevant floors had redesigned those floors. In all, the Court received into evidence fifty-seven such emails submitted by the Landlord and twenty-seven such emails submitted by the Debtor.[7]

The parties dispute the degree of cooperation that the Debtor received from the Landlord with respect to installation of the tower. The Debtor admits that Breslin was cooperative and responded to the Debtor's inquiries. (Hr'g Tr., Apr. 29, 2008, p. 533.) Its main complaint is that the Landlord's notices of default issued in 2007 created a climate of uncertainty and contention regarding the Lease that made it impossible for the Debtor to obtain outside financing for the cooling tower project or to convince its shareholders in Ireland to finance the project.[8] The Landlord also refused the requests of the Debtor's principals for a meeting and refused to respond to a settlement proposal that the principals conveyed on November 19, 2007. Although the Debtor made some efforts to move forward on construction toward the end of 2007, it cannot be disputed that it started much too late to complete the project by the Lease deadline of December 31. Installation of a cooling tower entails significant construction work over an extended period at a cost of more than $1 million, and no work could have been performed toward the end of December on actual installation of the tower because of a City moratorium on

---

[7] After this case was brought, information disputes continued. On March 20, 2008, the Landlord moved by order to show cause for a preliminary injunction that would in effect excuse the Landlord's agents from responding to any of the Debtor's requests for information or walkthroughs on the ground that the Debtor's requests were burdensome and that any progress made on installing the Cooling Tower might prejudice the outcome of its motion to dismiss. The Landlord offered to extend the Debtor's time to assume or reject during a standstill period but the parties could not come to any agreement. The Court held a hearing on March 26, 2008, following which it denied the motion from the bench, holding that the Landlord had not shown irreparable injury.

[8] The Court heard testimony from Timothy Brosnan, the largest investor, who had invested $3 million in MAC to fund the Debtor following the first bankruptcy. Brosnan testified that the Landlord's notices throughout 2007 caused him concern about financing the tower.

work in the Times Square area prior to the celebration of New Year's Eve.[9]  In short, the

Debtor simply ran out of time.

*The Debtor's Second Chapter 11 Filing*

On December 27, 2007, three days before the Lease deadline for construction of

the cooling tower, the Debtor filed the instant bankruptcy case.  Concurrently with the

petition the Debtor filed a motion in which it sought to vacate that part of the Stipulation

in the prior case that required it to install a cooling tower by December 31, 2007, and it

filed an adversary proceeding against the Landlord seeking a declaration that the

Landlord's actions in 2007 had frustrated the Debtor's ability to perform under the Lease.

At the time of the petition, according to the Debtor's amended schedules, it had

$2,650,201.49 in prepetition unsecured claims, $1 million of which was owed to the

Landlord, another $1 million owed to Brosnan, its principal shareholder, and $235,000

owed to Hanlon.  Three secured creditors are listed with secured claims for equipment

leases or prepaid dining charges, totaling $178,920.  There are fifty-eight other creditors

with general unsecured claims totaling approximately $415,200.

The Landlord responded to the Debtor's filing with a motion for relief from the

automatic stay (or a determination that the automatic stay was not in effect).  The

Landlord did not ask the Court to dismiss this case as a bad faith filing.  It argued that the

conditional limitation, incorporated in the Lease, requiring tower installation by the end

of 2007, resulted in the automatic termination of the Lease on December 31, 2007, as the

---

[9] For this project, a two-ton cooling tower would have to be hoisted up to the roof of the Gershwin Theatre
by a specialized crane service and secured to the roof in a location able to support its weight without
damage to the theatre's operations.  The City of New York would have to issue multiple permits.
Connecting the cooling tower to the restaurant would also involve gaining access to the building's electrical
infrastructure, constructing new pipes, and taking the restaurant off the building's existing systems.   The
project cost is currently estimated by the Debtor at $1.4 million, although Hanlon hopes it will ultimately
cost $1.2 million (Hr'g Tr. Apr. 29, 2008, p. 607).  There is no dispute that it will take weeks (if not
months) to obtain all the permits and to complete the project.

tower had not been installed by that time.  The Landlord also denied that the Court in the

instant case had any jurisdiction to amend a stipulation entered in a closed, earlier case.

The Debtor opposed the Landlord's motion for stay relief, arguing among other things

that the Bankruptcy Code gave it time to assume or reject the Lease and prevented the

Landlord from relying on a post-petition default.

On January 30, 2008, the Court denied both the Landlord's and the Debtor's

motions from the bench.  (Hr'g Tr., Jan. 30, 2008, p. 50.)  The Court denied the Debtor's

motion for an order amending the Stipulation in the 2002 case on the ground that it had

no power to amend an order in a prior, closed case.  The Court denied the Landlord's

motion for relief from the stay on the ground that § 365 of the Bankruptcy Code gives a

debtor a limited amount of time to assume or reject a nonresidential real property lease,

where the conditional limitation in the lease has not yet been triggered, and even if the

default were otherwise what is known as an "incurable historical default".[10]  The Court

noted that there had been a split of authority as to the effect of "incurable historical

defaults" in prior cases under § 365 of the Bankruptcy Code, but that § 365(b)(1)(A) of

the Code, as amended in 2005, gave a debtor time to cure an historic or non-monetary

default that might, under non-bankruptcy law, be considered incapable of cure.  *See* 3

*Collier on Bankruptcy* ¶ 365.05 (15th ed. rev. 2007).[11]  Because the statute allows a

debtor to cure an historical default, the Court also held it did not have to decide whether

---

[10] The Landlord argued that the Debtor could not cure the default since December 31, 2007 had passed and the deadline to install the cooling tower had been missed.

[11] The prototype historical default is a provision in some leases requiring the lessee to remain open continuously or to meet certain sales targets.  Lessors argued that a debtor that had "gone dark" for a period or that had missed the targets could not cure the default.  Before the 2005 amendments to the Bankruptcy Code there was a split in authority as to a debtor's ability to cure such a default.  *Compare Worthington v. General Motors Corp.* (*In re Claremont Acquisition Corp.*), 113 F.3d 1029, 1034-35 (9th Cir. 1997) (no right to cure nonmonetary defaults), *with Eagle Ins. Co. v. BankVest Capital Corp.*, 360 F.3d 291, 300-301 (1st Cir. 2003) (inconsistent with policies underlying Code not to allow cure of non-monetary default).

the Lease, as amended by the Stipulation, required the Landlord to give the Debtor notice of the default in order to trigger the conditional limitation.[12]

The Landlord filed a notice of appeal from the order effectuating the Court's oral ruling that the Debtor had time to cure, but it did not pursue the appeal. Instead, on February 13, 2008, it substituted counsel and, four weeks later, filed the instant motion to dismiss. The Debtor concurrently filed motions to extend time to assume or reject the nonresidential Lease and to extend the time in which the Debtor can exclusively file a plan of reorganization. As noted above, the Landlord's motion for a preliminary injunction, which would have enjoined any contact between the parties' agents or employees in connection with the cooling tower and would have had the effect of stopping any progress on the cooling tower's installation, was denied. The motion to dismiss was then the subject of a hearing on April 9, 10, 11, 28, and 29. As also noted above, the Debtor's motions to extend time were granted without prejudice to the determination of the Landlord's motion.

[12] It found that the Stipulation, standing alone, could be read to create an automatic termination of the Lease if the tower were not installed by December 31, 2007, but that the clause, which was incorporated in the Lease, could also be read to require the Landlord to serve a notice of default and a demand to cure. *See* §§ 12.01(e) and (f) of the Lease. There is no dispute that after the Chapter 11 filing, the Landlord was barred from sending a notice of default by the automatic stay.

<u>DISCUSSION</u>

*Bad Faith*

The Landlord has moved to dismiss this bankruptcy case on the ground that it was filed in bad faith.  Although motions to dismiss for lack of good faith are usually predicated on § 1112 of the Bankruptcy Code, providing for dismissal of a Chapter 11 case for "cause," neither in § 1112 nor in any other part of the Code is there a specific requirement that a filing be in "good faith."  The doctrine has been developed by judges to ensure that the extraordinary powers and rights given to Chapter 11 debtors are not abused.  In the usual case, the test of bad faith in this Circuit is whether "it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings."  *Baker v. Latham Sparrowbush Assoc.* (*In re Cohoes Indus. Terminal, Inc.*), 931 F.2d 222, 227 (2d Cir. 1991), quoted in *C-TC 9th Ave. P'ship v. Norton Co.* (*In re C-TC 9th Ave. P'ship*), 113 F.3d 1304, 1309 (2d Cir. 1997).  The test as a whole looks to the Debtor's intentions and realistic goals.  There is no question that the power to dismiss on bad faith grounds should be used "with great care and caution."  *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989).

Although this case bears some of the usual indicia of a bad faith filing, there is no basis for a finding that the Debtor did not, on the filing date, have an intention to reorganize and a reasonable probability of a successful case (if it can save its Lease).  Moreover, this case does not evidence most of the factors of a bad faith filing that were listed by the Court in *C-TC 9th Ave. P'ship*.[13]  The Debtor's revenues are improving, it

---

[13]  In *C-TC 9th Ave. P'ship*, the Second Circuit listed several factors as indicia of a bad faith filing.  They are:

can meet its expenses, including installation of the cooling tower, it employs

approximately 100 people, and it has 58 general unsecured creditors (not counting

insiders).  If the Debtor can build the cooling tower and cure its default under the Lease,

it expects to be able to pay its creditors in full and operate successfully in the future.  It

appears to be the Debtor's position that it can do so notwithstanding termination of the

late-night parties.

However, this is not the usual case because there was an earlier confirmed and

consummated plan of reorganization for this same debtor.  There is authority that "Where

a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus

on whether the second petition was filed to contradict the initial bankruptcy

proceedings."  *Elmwood Dev. Co. v. General Elec. Pension Trust* (*Matter of Elmwood*

*Dev. Co.*), 964 F.2d 508, 511 (5th Cir. 1992).  The Landlord claims this case is a repeat

filing the only purpose of which is to modify the Debtor's obligations under the first Plan,

specifically the Stipulation setting a December 31, 2007 deadline for installation of the

cooling tower.  The Landlord argues that any modification of the 2005 Plan is barred by §

1127(b) of the Bankruptcy Code, which prohibits modification of a confirmed plan after

---

(1) the debtor has only one asset;
(2) the debtor has few unsecured creditors whose claims are small in relation to those of
the secured creditors;
(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or
default on the debt;
(4) the debtor's financial condition is, in essence, a two party dispute between the debtor
and secured creditors which can be resolved in the pending state foreclosure action;
(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate
efforts of the debtor's secured creditors to enforce their rights;
(6) the debtor has little or no cash flow;
(7) the debtor can't meet current expenses including the payment of personal property
and real estate taxes; and
(8) the debtor has no employees.

*C-TC 9th Ave. P'Ship*, 113 F.3d at 1311.

it has been substantially consummated.[14]  *See Elmwood*, 964 F.2d at 511; *In re Tillotson*, 266 B.R. 565, 568 (Bankr. W.D.N.Y. 2001); *In re Northtown Realty Co., L.P.*, 215 B.R. 906, 911 (Bankr. E.D.N.Y. 1998).  In *Fruehauf Corp. v. Jartran, Inc.* (*In re Jartran, Inc.*), 886 F.2d 859 (7th Cir. 1989), the Seventh Circuit sustained a second filing but said that a second reorganization case, "'with an eye towards curing defaults arising under a previously confirmed chapter 11 plan, is so akin to modifying the previous plan' as to be impermissible." *Jartran*, 886 F.2d at 867, citing *In re Northampton Corp.*, 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984).[15]

Notwithstanding the importance of protecting the integrity of the reorganization process, there are exceptions to the rule against serial filings.  Second reorganization cases that would modify earlier plans have been permitted on a showing of unanticipated changes in circumstances that were not foreseeable at the time the first plan was confirmed.  *See Elmwood*, 964 F.2d at 511; *Tillotson*, 266 B.R. at 569, citing *In re Adams*, 218 B.R. 597 (Bankr. D. Kan. 1998); *Northtown Realty Co.*, 215 B.R. at 911.  As the Circuit Court stated in *Elmwood*, "A second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief." *Elmwood*, 964 F.2d at 511-12.  The debtor must have a genuine need to reorganize, and

---

[14] Section 1127(b) reads in relevant part, "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . ."

[15] In *Jartran*, the debtor filed a second Chapter 11 petition within one-and-a-half years of the first.  A creditor objected to the alteration of its rights under the first plan and demanded that its claim be given administrative priority in the second case because that is what was promised in the first plan.  *Id.* at 859.  Ruling against the creditor, the Seventh Circuit distinguished *Jartran* from other Chapter 11 cases that had treated serial filings as in bad faith *per se*.  The Court placed particular importance on the fact that the debtor planned to liquidate in the second Chapter 11 case and did not intend to base its new plan on the avoidance of obligations arising from the first case.  "Rather, the new plan is for liquidation—and the bankruptcy court specifically found that 'Jartran II is not an attempt to modify the terms of the Plan, but rather is a good faith admission that Jartran was unable to continue operating as a going concern.'" *Id.* at 868, citing *In re Jartran*, 71 B.R. 938, 942 (Bankr. N.D. Ill. 1987).

these unforeseen changes in circumstance must contribute to the debtor's default under its obligations from the earlier bankruptcy. However, so as not to undercut § 1127(b), "courts construe the concept of material change in circumstances quite narrowly." *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997), citing *In re Roxy Real Estate Co., Inc.*, 170 B.R. 571, 576 (Bankr. E.D. Pa. 1993).

Moreover, the provisions of the prior Plan which the Debtor proposes to amend must be an "integral component" of an earlier plan of reorganization, as this factor bears on the equities of whether the provision can be modified. *See In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001); *Tillotson*, 266 B.R. at 568. In *Trans World Airlines*, TWA's third Chapter 11 case, the Bankruptcy Court held that the debtor was entitled to reject a contract under Bankruptcy Code § 365 notwithstanding that in its prior case it had committed not to reject the contract in a subsequent bankruptcy and this commitment had been made part of the confirmation order. Arguing that the debtor was judicially estopped from amending its prior plan, the creditor contended that it had relied on the debtor's waiver of rejection rights in any future case when it agreed to the provision in the earlier confirmed plan. The Court held that the confirmation order standing alone was insufficient evidence that the earlier Court had relied on the commitment in confirming the plan. It concluded that the provision had not been an integral part of the prior plan and said that the creditor's "argument leads to the untenable conclusion that judicial approval of a contract is a representation by the parties to the court not to breach the contract in the future." *In re Trans World Airlines*, *Inc.*, 261 B.R. at 113 (emphasis omitted).

*The Filing of this Case*

At the time it filed this case, the Debtor did not argue that circumstances had changed since it confirmed its first case, but it did file an adversary proceeding claiming that the Landlord had frustrated its performance under the contract by precluding it from obtaining financing for the cooling tower's construction.  If a party intentionally frustrates another's performance, it cannot prevail in an action against the non-performing party premised on the missed performance.  A litigant seeking relief must have "acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 342 U.S. 806, 814-15 (1945); *see also Little Creek Dev. Co. v. Commonwealth Mortgage Corp.* (*In re Little Creek Dev. Co.*), 779 F.2d 1068, 1072 (5th Cir. 1986) ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.'").  If a creditor sabotages a debtor's performance under a plan of reorganization, it cannot cry foul when the debtor fails to perform.  Such an outcome would indeed be unanticipated by the debtor, which is entitled to rely on the performance of creditors' obligations under a Plan.

The Debtor has effectively abandoned the adversary proceeding in which it alleged contract frustration, and wisely so.  On the record before it, the Court finds that the Debtor has failed to prove that the Landlord frustrated its attempts to build the cooling tower.  The Landlord admittedly sent notices of default to the Debtor, plus a demand to increase insurance coverage, but there is no evidence that the notices were sent in bad faith or that they did not have a valid basis.  The parties' dispute over the Debtor's late-night parties was longstanding and if the Landlord gave the Debtor

significant forbearance in connection with the use covenant, there is no evidence that it

waived its right to insist on compliance with the provision.[16]  Newman credibly testified

that the notices of default were sent because the Landlord felt it was being damaged by

what it perceived as the Debtor's disregard of the use limitations in the Lease and its

other defaults.  A party is entitled to enforce what it believes in good faith to be its legal

rights.  *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998);

*Thur v. IPCO Corp.*, 173 A.D.2d 344, 569 N.Y.S.2d 713 (1st Dept. 1991), *app.*

*dismissed*, 78 N.Y.2d 1007, 575 N.Y.S.2d 457 (1991).

Moreover, the Debtor failed to demonstrate that its access to funds and financing

for the tower was wholly frustrated by the Landlord's legal actions.  The testimony of one

of the Debtor's principal investors was that at all relevant times he had the capacity to

advance funds to the Debtor to build the tower.  Moreover, the investor has now placed

$600,000 in escrow towards the costs of installing the tower, and he testified that he will

cover the remaining costs.

Nevertheless, even though the Debtor did not prove that the Landlord had

frustrated its performance under the Lease, the question is not whether there was

frustration of performance.  There are two related questions that must be considered in

connection with a determination as to the Debtor's good faith:  First, whether there was a

change of circumstances sufficient to justify the second Chapter 11 case and afford the

Debtor time to install the tower.  Second, whether the Debtor's breach was a provision in

---

[16] This Court does not make the finding that the Debtor's late-night parties violated the Lease, an issue that is the subject of pending State court litigation.  Under the Lease, however, waiver cannot be implied from the Landlord's prior conduct in countenancing "events."  § 18.02.  The Court finds only that the Landlord had a good faith basis for demanding compliance with the use provisions and for contending that the Debtors' parties were consistent neither with the use provisions of the Lease nor the Stipulation entered into the prior case.  That Stipulation did not forbid the Debtor from hosting parties only if rap or hip-hop music were played (as the Debtor seems to contend now), but it covered similar events "regardless of type of music or theme."

the first Chapter 11 case that was so integral to the prior Plan that it should be deemed

incurable through a second Chapter 11 filing.  Although the question is a close one, the

Court is persuaded that the good faith requirements relating to a second Chapter 11 filing

should not be construed to preclude this Debtor from curing its default.

First, there was some limited change in circumstances.  The Debtor's prior good

relations with the Landlord had changed, and the investors had a good faith reason to be

concerned.  Financing was not precluded, but the Debtor did establish that the Landlord's

multiple notices of default made it impractical for the Debtor to finance the cost of

building the tower through any source other than its foreign investors.  Standing alone

this change in circumstances was not sufficient to justify the filing.[17]

But it does not stand alone, as the Debtor's default does not relate to a provision

that was a provision of the previous Plan.  Concededly, the requirement of installation by

December 31, 2007 was incorporated in a Stipulation that was approved in connection

with entry of the Confirmation Order.  However, the terms on which the Lease was

assumed were not a Plan provision, and there is no evidence that they were to be

---

[17] The Debtor has totally failed to explain its response to the actions of an increasingly hostile Landlord. Assuming that the Debtor's principals did at all times want to save the Lease and their millions of dollars in leasehold improvements, they have never explained why they gave their Landlord the ability to argue that the Lease had irrevocably terminated under applicable law.

The Debtor also offered a downturn in general economic conditions as a change in circumstances justifying the second filing.  In ¶ 15 of its Opposition to the Landlord's Motion to Dismiss, the Debtor alleges that its business has suffered because "the country appears to have slipped again into a recession at the end of 2007."  Changes in general economic conditions, however, are "an insufficient basis for a second Chapter 11," because parties should anticipate market downturns when taking on new obligations under a plan of reorganization.  *Northtown Realty Co.*, 215 B.R. at 913, citing *Lincoln Nat'l Life Ins. Co. v. Bouy, Hall & Howard and Assocs.* (*In re Bouy, Hall & Howard and Assocs.*), 208 B.R. 737, 745 (Bankr. S.D. Ga. 1995) and *In re Roxy Real Estate Co., Inc.*, 170 B.R. at 576.

The Debtor also made the argument that the Landlord did not want or need a cooling tower and that this whole dispute is a tactic to terminate a below-market lease.  There is nothing in the record to support the contention that the Landlord does not want the Debtor to install a cooling tower.  The Landlord has insisted on the construction of a cooling tower since the Lease took effect in 1998.  Its senior vice-president testified as to the reasons why the Landlord bargained for the Debtor's construction of a cooling tower.  Moreover, it is not even clear on this record whether the Debtor holds a below-market lease.

enforceable on an ongoing basis as a Plan provision.  On the contrary, provisions in the

Stipulation relating to the Lease were intended to be and were in fact incorporated into

the Lease, and they were intended to be enforceable as such.  The Landlord argues that

the December 31, 2007 deadline should be enforced not only as a Plan provision but as a

conditional limitation in a lease that the tenant cannot cure.  The dispute is most

appropriately characterized as one involving an ongoing obligation of the reorganized

entity, not an integral provision of the prior case that the Debtor cannot breach.  *See In re

Trans World Airlines, Inc.*, 261 B.R. at 113.

The Court recognizes that finality is an important aspect of any plan of

reorganization.  Any Chapter 11 case is likely to represent a long, arduous process for

debtors and creditors alike, and parties should be able to rely on the finality of deals

agreed to in connection therewith.  The Court is sympathetic to a Landlord's desire that

there be an absolute deadline, beyond which it will simply not have to deal with a tenant

any longer.  If finality were the only issue, the Court might find that the case should be

dismissed on bad faith grounds.  But finality is not the only issue, as it is rarely the only

issue in landlord-tenant disputes.  In addition to the fact that the December 31, 2007

deadline was not, strictly speaking, a provision "integral" to the Plan, the critical issue on

this motion is that the Landlord is asking the Court to apply a judge-made doctrine in a

manner that would result in the forfeiture of a lease.

There are many cases in which courts have refused to countenance a lease

forfeiture.  As the Second Circuit said in *Queens Blvd. Wine & Liquor Corp. v. Blum*, 503

F.2d 202, 206 (2d Cir. 1974), a case under Chapter XI of the prior Bankruptcy Act,

"Courts traditionally have not favored lease forfeitures.  They often have strained to

19

construe forfeiture claims narrowly or to find them not an 'express' covenant within the requirement of the statute."[18]  The Circuit held there that a reorganization court, determining whether to enforce a clause permitting the Landlord to terminate the lease on a bankruptcy filing, "must consider not only the interests of the landlord but also those of the debtor and its creditors."  *Queens Blvd.*, 503 F.2d at 206.  It found that the reorganization court had discretion to refuse to enforce a lease termination clause where forfeiture of the lease would have "totally frustrated an arrangement by depriving the debtor of an asset absolutely necessary to its continued viability," and where the landlord would not suffer any real prejudice.  *Id.* at 207.

Since *Queens Blvd.* was issued, the Bankruptcy Code has rendered bankruptcy termination clauses unenforceable and § 365 of the Code has a series of provisions that govern nonresidential real property leases in a Chapter 11 case, balancing the interests of landlords and tenants.  The rights of debtors cannot lightly be limited, as the Second Circuit re-emphasized just last month, commenting on "the Code's overriding policy favoring debtor reorganization and rehabilitation."  *COR Route 5 Co., LLC v. The Penn Traffic Co.* (*In re The Penn Traffic Co.*), ___ F.2d ___, 2008 WL 1885328 at * 7 (2d Cir. April 29, 2008), quoting *Pub. Serv. Co. of N.H. v. N.H. Elec. Coop.*, (*In re Pub. Serv. Co. of N.H.*), 884 F.2d 11, 15 (1st Cir. 1989).  The Circuit Court held in that case that a counterparty's actions subsequent to the petition date could not terminate a debtor's statutory right to assume or reject an executory contract under § 365.

Moreover, bankruptcy courts also consider "whether the termination could have been reversed under a state anti-forfeiture provision or other applicable state law."  *City*

---

[18] This was a reference to § 302 of the Bankruptcy Act, now repealed, that provided that "an express covenant that . . . the bankruptcy of a specified party . . . shall terminate the lease or give the other party an election to terminate the same shall be enforceable."  11 U.S.C. § 702 (1970) (repealed).

20

*of Valdez v. Waterkist Corp.* (*In re Waterkist Corp.*), 775 F.3d 1089, 1091 (9th Cir.

1985).  It is therefore highly relevant that lease forfeitures are "abhorrent" under New

York State law.  *See Zaid Theatre Corp. v. Sona Realty Co.*, 18 A.D.3d 352, 355, 797

N.Y.S.2d 434, 436-37 (1st Dept. 2005).  As indicated by the history of this matter,

tenants can obtain a "*Yellowstone*" injunction precluding the Landlord from enforcing its

rights under many circumstances.  *See*, *e.g.*, *TSI West 14, Inc. v. Samson Assocs., LLC*, 8

A.D.3d 51, 52-53, 778 N.Y.S.2d 29, 31 (1st Dept. 2004); *Becker Parkin Dental Supply

Co., Inc. v. 450 Westside Partners, L.L.C.* 284 A.D.2d 112, 112-13, 725 N.Y.S.2d 547

(1st Dept. 2001); *Long Island Gynecological Servs. v. 1103 Steward Ave. Assocs. Limited

P'ship*, 224 A.D.2d 591, 594, 638 N.Y.S.2d 959, 962 (2d Dept. 1996); *225 E. 36th St.

Garage Corp. v. 221 E. 36th Owners Corp.*, 211 A.D.2d 420, 422, 621 N.Y.S.2d 302,

304 (1st Dept. 1995).

It must be emphasized that the question here is not whether the conditional

limitation in the Lease should be enforced but whether the doctrine of good faith should

be applied to the facts of this case in a manner that *might* lead to forfeiture of the Lease.

The same reasons that the Circuit Court canvassed in the *Queens Blvd.* case support the

conclusion that, under the facts of this case, it should not be so applied.  The harm to the

Debtor and its creditors would be great.  The Debtor would lose not only its very

substantial leasehold improvements, but also the funds it has expended since the

commencement of this case on installation of the tower.  It should be recalled that the

Debtor expended funds on the project even before the Landlord made its motion to

dismiss, some two months into the case. The Landlord's delay in making this motion is not irrelevant in considering the equities.[19]

In contrast to the grave harm to the Debtor, the harm to the Landlord can be minimized and compensation can be provided. The question is not whether the cooling tower will be installed—if the Debtor remains in possession, the only question is when. If the Debtor moves to assume, the Landlord will have to be compensated not only for its legal fees in litigation with the Debtor but also for any losses it can establish for inability to sell condenser water to other tenants during the 2008 summer months.

Moreover, the actual benefit to the Landlord of an immediate dismissal is uncertain. The Court takes particular note of the Landlord's plea, in its "Post-Trial Memorandum of Law on Motion to Dismiss," that the Court not merely dismiss the case but either order the immediate eviction of the Debtor or the appointment of a Chapter 11 or Chapter 7 trustee. The Landlord states,

> Landlord is concerned that dismissal of the case will result in continuing litigation in the state court, including additional attempts at injunctions, which will lead to Debtor's continued occupancy, nonpayment of rent, non-construction of the Cooling Tower, unauthorized nightclub events, and possibly other mischief. Thus Debtor's bad faith in filing will be perpetuated during additional rounds of litigation. Debtor sought relief in this Court, and Landlord respectfully submits that this Court should grant appropriate relief to all parties in interest, including Landlord. Thus Landlord seeks alternate relief to being granted termination of the Lease and right to immediate possession. (p. 18.)

---

[19] Nevertheless, the Debtor cannot assert that the Court's prior order denying the Landlord's motion for relief from the stay precluded the Landlord from filing this motion. The issues on the prior motion were different and, in any event, there was no final judgment on the merits, a requirement for application of both *res judicata* and collateral estoppel. *See Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 88 (2d Cir. 1997) (*res judicata*); *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (collateral estoppel). Nor has the Debtor provided support for the principle that the Landlord waived its right to make a motion to dismiss or that the Landlord elected its remedies. A motion for relief from the stay does not ordinarily preclude the filing of the other motions in the case if stay relief is denied.

Obviously, if the Court dismisses the case on the ground that the case should never have been filed at all, it can only remit the Landlord to its State remedies, not order the Debtor's eviction under State law.  It would be entirely inconsistent with an order of dismissal for the Court to preclude the Debtor from exercising any State remedies it may have to prevent forfeiture of its Lease.[20]

On the other hand, if the case is sustained, it is the Court's obligation to minimize harm to the Landlord and all other parties in interest.  There is no question that this Debtor has had to file two Chapter 11 cases in less than six years.  The Debtor mismanaged the tower installation prior to the filing in this case and has shown little progress since then.  After the petition was filed, it fired its general contractor, who had been approved by the Landlord, hired a less-expensive but unqualified replacement, and then had to rehire the prior contractor based on the Landlord's refusal to approve the replacement.[21]  There is still no evidence before the Court that the Debtor has purchased the tower or that it even has a timetable for completion of installation.  At the same time the late-night parties have continued without any indication that the Debtor has attempted to restrain them or the advertising that supports an after-hours nightclub operation on the premises of a restaurant that is ostensibly oriented toward children.

Accordingly, even though it sustains the case, the Court agrees that the case cannot continue to be administered as it has been.  The Court will not appoint a Chapter 11 or Chapter 7 trustee at this time.  The Debtor and other parties in interest should have an opportunity to be heard on any such motion, and also on the possible appointment of

---

[20] The Bankruptcy Code provides for a debtor that is a lessee under a nonresidential real property lease to surrender possession to the Landlord if it does not timely assume or reject the lease, § 365(d)(4), but this of course assumes that there is a valid case, not a dismissal on grounds of bad faith.

[21] The Lease provision on which the Landlord relied was explicit in giving the Landlord a right to approve or disapprove the Debtor's general contractor in this major project in its sole discretion.

an examiner.  The Debtor should also have an opportunity to appoint an officer or

representative, reasonably acceptable to the Landlord, to organize and supervise

installation of the tower.  There is no question that the Debtor's management knows how

to operate a restaurant, but no evidence that the Debtor can accomplish the prompt

installation of a cooling tower.  The Debtor and Landlord are directed to meet and confer

on the immediate retention of a qualified professional.  If such a person is not retained by

the Debtor within 10 days, to take charge of the tower's installation, the Landlord may

file a motion on shortened notice for a Chapter 11 trustee, for conversion to Chapter 7, or

for an examiner.

The parties have an action pending in State court on the issue whether the late-

night parties are appropriate under the use-clause in the Lease or the Stipulation agreed to

in the Debtor's prior Chapter 11 case.  This Court does not intend to decide that case.

However, it does have an obligation to reduce the harm to the Landlord from

continuation of this Chapter 11 proceeding.  The Landlord may, if it is so advised, file an

immediate motion for a moratorium on the late-night parties, if the Debtor is not willing

to terminate them until the State court has ruled.

As noted above, one of the investors in the Debtor has purported to escrow

$600,000 with Debtor's counsel for the construction of the tower.  Debtor's counsel is

hereby ordered not to release or encumber the $600,000 pending further order of this

Court.  The Debtor is further directed to file a statement as to the total anticipated cost of

the tower within ten days of appointment of a professional described above.  The Debtor

must promptly thereafter escrow the remainder of the funds necessary to install the tower.

<u>CONCLUSION</u>

The Landlord's motion to dismiss is denied.  The Landlord may move for the appointment of a trustee or examiner under Chapter 11, or conversion of this case to a case under Chapter 7, if the Debtor has not within ten days appointed a qualified person to supervise all aspects of the installation of the tower.  The Landlord may also move for interim relief in connection with the late-night parties if it is so advised.  The $600,000 in escrow shall not be released or encumbered absent further order of this Court, and the Debtor must in due course increase the amount in escrow to cover all anticipated costs of installation of the tower.

IT IS SO ORDERED.


Dated: New York, New York
       May 22, 2008

                          _/s/ Allan L. Gropper_____
                          ALLAN L. GROPPER
                          UNITED STATES BANKRUPTCY JUDGE